**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:16-CV-543-JVB-JPK |
| | ) | |
| JERRY FOZZARD, *et al.*, | ) | |
| Defendants. | ) | |

**FINDINGS, REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE PURSUANT TO**
**28 U.S.C. § 636(b)(1)(B) & (C)**

This matter is before the Court on a Motion to Set Damages Hearing (DE 56), filed by

Defendant and Cross-Claimant Galleria Property Owners Association ("GPOA"). District Court

Judge Joseph S. Van Bokkelen referred this matter to the undersigned for a report and

recommendation on GPOA's request for a judgment and determination of damages pursuant to 28

U.S.C. § 636(b)(1)(B). (DE 58, 97). This Report constitutes the undersigned Magistrate Judge's

combined proposed findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). For the

following reasons, the Court recommends that the District Court enter judgment in favor of GPOA

and against Cross-Defendant Jerry Fozzard as described below.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In 2003, Jerry Fozzard purchased a condominium at 425 Joliet Street, Unit 312, Dyer,

Indiana, for his medical staffing business, using a Small Business Administration loan. (DE 88

(2/5/21 Hearing Transcript), 27:18-28:22). By purchasing the unit, he became bound by GPOA's

Declaration of Condominium, which obliged him to contribute to the upkeep of 425 Joliet Street

and keep his own unit in a reasonable condition. (*See* DE 90 (1/20/21 Hearing Transcript), 18:24-

19:9; GPOA Ex. 1). By 2008, Fozzard's business was failing due to issues with his health and

financial difficulties accelerated by the nationwide economic recession. He fell behind on loan payments to the Small Business Administration and fees to GPOA. (DE 88, 29:14-30:14). By 2014, he had effectively abandoned the business and the unit. (*Id*.) E-mails from GPOA's directors to Fozzard "bounced back," and GPOA was unable to reach him. (*Id*., 48:10-20). Meanwhile, the empty unit was leaking and growing mold. (DE 88, 93:19-94:13; DE 90, 47:1-15, 84:18-22, 98:25-99:9). In January 2015, GPOA concluded that the disrepair was becoming a safety hazard. GPOA "took possession" of the unit, changed the locks, paid for the unit to be professionally cleaned, and began paying utilities to stabilize the temperature and prevent further damage. (*Id*.; GPOA Ex. 4, 34-96). GPOA billed Fozzard for these expenses, and placed a lien on the unit, although it was unable to collect anything from Fozzard. (*See* GPOA Exs. 6, 11).

On December 29, 2016, the United States filed a Complaint to foreclose Fozzard's mortgage on the unit. (DE 1). The Complaint named GPOA as a defendant because of its junior lien. On April 11, 2017, GPOA filed a cross-claim, alleging breach of contract by Fozzard, and a counterclaim, requesting that its lien be foreclosed and that the proceeds of any sale of the property be applied to Fozzard's outstanding balance. (DE 10).

The parties attempted to reach a global settlement, which involved trying to assess the value of the property. One appraisal commissioned by Fozzard valued the unit at $155,000; another, arranged by the United States, valued it at $170,000. (Fozzard Exs. 1-2). In addition, in November 2017, Galleria Realty Corporation ("GRC"), an entity with the same directors as GPOA that developed the property at 425 Joliet and owns many of the units, offered Fozzard $160,000 for the property. (Fozzard Ex. 5). Fozzard did not respond to the offer, because it was not enough to cover all his debts. (DE 88, 32:21-35:24; DE 90, 112:10-13).

In an agreed status report to the Court on March 15, 2019, the United States wrote: "The parties are endeavoring to submit an agreed judgment resolving this case and submit the same to the Court by April 15, 2019. [. . .] If the parties cannot agree to an agreed judgment, the plaintiff, United States of America, and the cross-claimant, Galleria Property Owners Association, Inc., shall file, respectively, motions for summary judgment by May 31, 2019." (DE 40). The Court ultimately set a deadline of June 10, 2019 for the parties to file an agreed judgment or a motion for summary judgment. (DE 43, 45). In the meantime, GPOA continued to pursue settlement discussions continued with Fozzard, but no agreement was reached. (*See* DE 93 at 18-19) (GPOA's proposed agreed judgment sent on March 12; e-mail correspondence sent by counsel for GPOA on April 15, April 24, May 13, and May 31).

On June 10, the United States filed a motion seeking entry of an agreed judgment between Fozzard and the United States only.[1] (DE 46). The motion was silent as to the status of GPOA's claim, and GPOA did not file a dispositive motion. On July 24, 2019, the Court entered the agreed judgment against Fozzard and for the United States in the amount of $172,537.88 plus interest and costs. (DE 47). The judgment specified that the property would be auctioned at a marshals' sale, with the proceeds distributed as follows: first, to pay the costs of the lawsuit; second, to the United States to satisfy its judgment; and the remainder, if any, to the Clerk of Court to be distributed later. (*Id.*)

The sale was scheduled for October 30, 2019, and notice was placed in the Crown Point Star once per week for four consecutive weeks. (DE 52). Meanwhile, the United States had begun to recoup some of its judgment through other means, such as garnishing Fozzard's tax payments.

---

[1] GPOA nonetheless consented to the agreed judgment. (*See* DE 46 at 2).

(*See* Fozzard Ex. 4). By the time of the marshals' auction, Fozzard owed the United States only $19,697.47, although he did not share that information with GPOA. (*See* DE 85, ¶¶ 2-3).

On the auction day, Victor "Bud" DiMaggio, the vice president of GPOA and a "principal" of GRC, attended to bid on behalf of GRC. DiMaggio was the only prospective bidder to attend. The U.S. Marshals delayed the sale for a half hour to accommodate any bidders who were running late, but no one else arrived. DiMaggio testified that he made an opening bid of $1, and the United States bid "approximately $19,700.00," apparently to match the amount needed to satisfy its judgment. DiMaggio beat the government's bid, and won the auction on behalf of GRC with a final price of $19,697.46. (DE 54, 57; DE 90, 79:11-82:14). The marshal's report, filed after the auction, indicated that the "grantee" of the deed was GRC. (DE 52 at 2). The United States filed a motion to confirm the sale based on the marshal's report. (DE 54). No party objected, and the Court granted the motion and confirmed the sale. (DE 55).

On March 4, 2020, GPOA filed its "Motion to Set Evidentiary Hearing on Damages." (DE 56). The motion sought "a judicial determination of the amount properly due and owing to GPOA together with an *in personum* [sic] and *in rem* judgment after an appropriate evidentiary Hearing [sic]." (*Id.*, ¶ 8). The motion was referred to the undersigned, and a hearing was set. In advance of the hearing, GPOA filed a statement of damages alleging that it had received "no remuneration" from the marshals' sale, and that Fozzard now owed GPOA $91,245.05[2] in unpaid assessments, attorney fees and interest. (DE 61). In response, Fozzard argued that the sale should be set aside because the result was unfair. Fozzard further argued that GPOA had not met its burden of proof to justify a judgment, and that DiMaggio "in bad faith usurped the corporate opportunity" of GPOA by bidding on behalf of GRC. (DE 64). In short, Fozzard argued that because GRC had won the

---

[2] GPOA's demand was subsequently revised to include further attorney's fees. (*See* GPOA Exs. 11, 12).

property at an apparent discount, Fozzard should not have to pay the alleged debt to GPOA, which was supposed to come out of the sale proceeds. These arguments were extensively developed, and supporting evidence introduced, during the hearing held on January 20 and February 5, 2021. (DE 79, 82). Supplemental briefing was filed after the hearing. (DE 92-94, 96). Since Fozzard argued after the hearing that the Court could not enter judgment without dispositive motions or a trial (*see* DE 96 at 5), the Court offered each party one final chance to offer any additional facts or argument as to liability, but both declined. (*See* DE 99).

## II.     ANALYSIS

This matter brings several questions before the Court: whether the Court can retain jurisdiction over the remaining state law claims; whether the marshal's sale should be set aside based on Fozzard's objections; whether the Court can enter judgment without dispositive motions or a trial; and, if so, whether GPOA is entitled to judgment against Fozzard, and for how much. The Court considers each in turn.

### A.     Jurisdiction

The Court retained original jurisdiction over this case because the United States was the plaintiff. 28 U.S.C. § 1345 ("[T]he district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States. . ."). The claim by the United States has been resolved by an agreed judgment, which has been deemed satisfied. (DE 47, 81). Under these circumstances, the Court must "reassess its earlier decision to exercise jurisdiction over [the remaining] claims that have no independent federal jurisdictional basis." *United States v. Zima*, 766 F.2d 1153, 1157 (7th Cir. 1985). The Court must determine whether it has the power to retain jurisdiction, based on a common nucleus of operative fact among the federal and state claims, and whether it should exercise the discretion to do so, in the interests of "judicial economy,

convenience and fairness to litigants." *Id*. at 1158 (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)); *see also* 28 U.S.C. § 1367(a) ("In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."). Although courts have broad discretion, there is a presumption in favor of relinquishing the remaining claims, which can be rebutted when "substantial federal judicial resources have already been committed" to the resolution of the remaining claims. *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 479-80 (7th Cir. 2012).

Although no party disputes the Court's jurisdiction, the Court observes that the claims in this case arise from the same series of events, specifically, the disposition of 425 Joliet Street, Unit 312 (*see supra*), and that substantial resources have already been expended on the resolution of the remaining claims. Moreover, Fozzard's request to overturn the judicial sale, if granted, would require the involvement of the United States once again, presumably to participate in a second judicial sale. The Court finds that the exercise of supplemental jurisdiction is proper, and the most efficient way to resolve this case. *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–73 (1997) ("district courts [should] deal with cases involving pendent claims in the manner that best serves the principles of economy, convenience, fairness, and comity").

### B.    Marshal's sale

Fozzard argues that the marshal's sale should be set aside because the sale price was far below the value of the property, or in the alternative, that any remaining debt to GPOA should be set aside as a matter of equity. The Court addresses the marshal's sale first. Under Indiana law, "[w]here it appears that the results of a sale are such that entry of a deficiency judgment is shocking to the court's sense of conscience and justice, the sale may be set aside or the request for a

deficiency judgment denied." *Arnold v. Melvin R. Hall, Inc.*, 496 N.E.2d 63, 65 (Ind. 1986). "Mere inadequacy of price alone may be sufficient to justify setting the sale aside. To have this effect, however, the disparity between the value of the property sold, and the price paid, must be so great as to shock the sense of justice and right." *Id.* (quoting *Branch v. Foust* (1891), 130 Ind. 538, 543).

It is beyond dispute that Fozzard received less than the market value of the property at the auction. Fozzard notes that the appraisers valued the unit at $155,000 and $170,000, and GRC had previously offered to buy the unit for $160,000, while the unit ultimately sold for $19,697.46. (*See* Fozzard Exs. 1, 2, 5). But that is an apples-to-oranges comparison. In assessing the "value of the property" on a challenge to a marshal's sale, the Court looks to what the property could have reaped at a properly conducted marshal's sale, not what the seller could have gotten under normal market conditions. *See Lomas & Nettleton Co. v. Wiseley*, 884 F.2d 965, 969 (7th Cir. 1989) ("The test is the difference between the amount realized at the sale and the amount that could have been realized at a proper sale."); *Dempsey v. Carter*, 859 N.E.2d 1290 (Ind. Ct. App. 2007) ("[T]he test of inadequacy of price, is not what the property is worth, but what it will bring at a fair Sheriff's sale, which is a forced sale . . .") (quoting *Gilbert v. Lusk*, 123 Ind. App. 167, 183 (1952)).

A marshal's sale offers less than ideal circumstances in which to sell commercial real estate. Fozzard did not have the option to reject low offers or wait for better ones. "[M]arket value . . . has no applicability in the forced-sale context; indeed it is the very *antithesis* of forced-sale value. . . . [F]air market value presumes market conditions that, by definition, simply do not obtain in the context of a forced sale." *BFP v. Res. Trust Corp.*, 511 U.S. 531, 538 (1994) (emphasis in original). Unfortunately, this was what Fozzard signed up for when he agreed to the judgment calling for the property to be sold at a marshal's sale. Fozzard's appraisals and previous offer can be considered, but ultimately, "property that must be sold within those strictures is simply worth

7

less," and, most often, "the only legitimate evidence of the property's value at the time it is sold is the [forced] sale price itself." *Id*. at 538-39.

The Court must look at whether anything else about the marshal's sale, beyond the price, merits setting aside the sale. Those circumstances can include "fraud, irregularity, or great unfairness," *Centex Home Equity Corp. v. Robinson*, 776 N.E.2d 935, 942 (Ind. Ct. App. 2002), such as procedural errors, evidence of mistake or misapprehension, inequitable conduct, and problems with title. *Household Fin. v. Ness*, 810 N.E.2d 1146, 1148 (Ind. Ct. App. 2004). Ultimately, the circumstances must be "shocking to the court's sense of conscience and justice" to justify setting aside the sale. *Arnold*, 496 N.E.2d 63, 65. The Court must also consider that bidders should be able to rely on the results of judicial sales. *Lomas & Nettleton*, 884 F.2d at 970-71. If the auction is properly noticed and conducted, "[t]he sale, for all concerned, should be final." *Id*.

Fozzard asserts that DiMaggio acted improperly in bidding for the unit on behalf of GRC. At the hearing, DiMaggio conceded that GPOA (the condo association) was effectively "controlled" by GRC (the property developers who own several of the units). (DE 88, 123:4-17). Fozzard argues that either entity could have bid, but GPOA "conveniently stepped to the side" so that GRC could purchase the property at a bargain price.[3] Fozzard believes that as a matter of "diligence" in pursuing its claim, GPOA should have bid for the property, because it could have recouped some of the debt by buying the property for below market value and reselling it for a profit. (*See* DE 88, 8:25-9:15).

---

[3] GPOA argues that its directors did not have the power to purchase property on its behalf, and that GPOA would not have had the funds available to do so. (DE 90, 30:11-15; DE 93 at 6-7). Fozzard disputes both points. (*See* DE 92 at 10). However, as discussed below, it is not clear to the Court why GPOA should have been obligated to buy the property as a precondition for collecting Fozzard's debt.

But the relevant point for these purposes is that nothing DiMaggio, GPOA, or GRC did undermined the integrity of the auction itself. The sale price was lower than expected for two reasons: First, the United States had already recouped most of its judgment from Fozzard, so it was never going to bid more than $19,697.46. Second, and more importantly, DiMaggio was the only other bidder. That was not DiMaggio's fault – it was, most likely, the result of the property being sold at a forced sale. Whether he was representing GPOA, GRC, or someone else, the sale price would have been the same – one dollar more than the United States offered. Fozzard believes it was in GPOA's interest to bid, but that was GPOA's choice to make, not Fozzard's. There was no evidence indicating that DiMaggio subverted the wishes of GPOA's members by failing to buy property on its behalf. It was GRC, not GPOA, who made the original $160,000 offer for the unit; it is not surprising, nor "shocking to the court's conscience," that the property developer (GRC) was trying to purchase the unit, while the condo association (GPOA), representing the interests of all its unit owners, did not. There is no evidence of mistake, misapprehension, improper notice, or any other fact indicating that the sale was improperly conducted or that it did not fairly reflect the *forced* sale value of the property. Nor did Fozzard file a timely objection to the sale when the United States filed its motion to confirm it. (*See* DE 54, 55). Accordingly, the undersigned recommends that the district court deny Fozzard's request to set aside the sale.

### C.    Judgment Procedure

The undersigned recommends that the district court enter judgment in this case pursuant to Federal Rule of Civil Procedure 52(c), based on the proceedings conducted by the undersigned and the factual findings and conclusions of law herein.

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render

any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c). Although the rule refers to "nonjury trial[s]," it is applicable in a situation where the parties have been fully heard on an issue in an evidentiary hearing. *See*, *e.g.*, *Pinkston v. Madry*, 440 F.3d 879 (7th Cir. 2006) (affirming district court's judgment pursuant to Rule 52(c), based on a magistrate judge's recommended factual findings and conclusions of law following an evidentiary hearing); *Centimark Corp. v. Tecta Am. Corp.*, No. 1:08-CV-7323, 2010 WL 11606646 (N.D. Ill. Apr. 6, 2010) (granting Rule 52(c) motion after evidentiary hearing); *see also Fillmore v. Page*, 358 F.3d 496, 502-503 (7th Cir. 2004) (where parties had been fully heard on the relevant issues, Rule 52(c) permitted entry of judgment without a trial on those claims).

The undersigned makes this recommendation based on the unusual procedural posture of this case and the parties' clear representation that they have been fully heard on the issues presented. There was no dispositive motion, and no trial, because the parties did not request them. Instead, GPOA filed a single motion seeking an "appropriate evidentiary hearing" on judgment and damages, some eight months after the summary judgment deadline. (DE 56). The Court will address Fozzard's argument that GPOA waived any right to judgment by waiting too long to pursue it. However, there is no doubt that the parties have now been fully heard on all issues. In addition to the hearing and two rounds of briefing addressing judgment and damages (*see* DE 61, 64, 65, 88, 90, 92-94, 96), the Court allowed the parties one more chance to offer any further desired argument or briefing. Specifically, at a status hearing on November 10, 2021, the undersigned referenced the district court's renewed order of referral (DE 97) clarifying that the undersigned was to recommend whether judgment should be entered and stated that he intended to do so based on the evidence and argument already presented. Both parties declined to make any further argument, including dispositive motions. The parties did not object to the undersigned

issuing a recommendation on judgment based on the extensive proceedings already conducted. *Fillmore*, 358 F.3d at 503 (the parties' actions "can be understood only as an invitation for the judge to resolve matters" pursuant to Rule 52(c)).

### D.    Entry of Judgment

GPOA alleges that as of the date of the marshal's confirmation of sale[4], Fozzard owed $80,842.05 in past due assessments, plus further attorney's fees, costs, and interest. (DE 61, ¶ 8). GPOA's cross-claim against Fozzard is a breach of contract claim, based on alleged breaches of its Declaration of Condominium, which sets out rules that property owners at 425 Joliet Street must follow. (*See* GPOA Ex. 1). To obtain a judgment, GPOA must show that a contract existed between GPOA and Fozzard, and that Fozzard breached that contract, resulting in damages to GPOA. *Ent. USA, Inc. v. Moorehead Commc'ns, Inc.*, 897 F.3d 786, 793 (7th Cir. 2018).

There is no dispute that Fozzard became bound by the Declaration when he purchased Unit 312. (*See* DE 90, 18:24-19:9). Fozzard disputes some of the fines, which goes to the issue of damages, but there appears to be no dispute that Fozzard breached his obligations under the Declaration and failed to pay some expenses legitimately assessed by GPOA. (*See* DE 88, 31:19-32-4, 67:3-18). Fozzard instead argues that judgment should not be entered because GPOA failed to pursue its claim diligently. He points to GPOA's failure to file a motion for summary judgment as directed by the Court by June 10, 2019, and GPOA's failure to bid on the property at auction. Fozzard argues that the doctrines of laches, equitable estoppel, and unclean hands justify denying judgment to GPOA.

---

[4] Neither party presented any legal authority as to whether Fozzard should be responsible for the $4,213.26 in expenses accruing after the October 30, 2019 auction but before the April 3, 2020 delivery of the deed. (*See* GPOA Ex. 4 at 92-96). As a practical matter, having been locked out of the unit, it is unclear how much control Fozzard could have exerted over the unit after the auction. Nor was there any suggestion that Fozzard caused the delay – the property was not ordered to be conveyed until the United States's January 23, 2020 motion to confirm the sale was granted. (DE 54, 55). Without clear evidence that Fozzard would have been able to control the unit during this time, the Court finds that GPOA has not shown, to a reasonable certainty, that it is entitled to the costs from that period.

Laches can bar a claim when a claimant exhibits "(1) inexcusable delay in asserting a known right; (2) an implied waiver arising from knowing acquiescence in existing conditions; and (3) a change in circumstances causing prejudice to the adverse party." *SMDfund, Inc. v. Fort Wayne-Allen Cty. Airport Auth.*, 831 N.E.2d 725, 729 (Ind. 2005) (quoting *Shafer v. Lambie*, 667 N.E.2d 226, 231 (Ind. Ct. App. 1996)). Under the doctrine of equitable estoppel, a party who "by deed or conduct has induced another to act in a particular manner will not be permitted to adopt an inconsistent position, attitude, or course of conduct that causes injury" to the other party. *Brown v. Branch*, 758 N.E.2d 48, 52 (Ind. 2001). The doctrine of unclean hands permits a court to deny equitable relief to a claimant who has not "behaved in a manner justifying that relief." *Woodruff v. Indiana Fam. & Soc. Servs. Admin.*, 964 N.E.2d 784, 792 n. 5 (Ind. 2012).

Fozzard argues, correctly, that the parties had discussed GPOA moving for summary judgment, and that GPOA was directed to file any such motion by June 10, 2019. (*See* DE 44, 45). GPOA did not do so, but filed a motion on March 4, 2020, which sought judgment "after an appropriate evidentiary hearing." (DE 56, ¶¶ 5, 8). Whatever the merits of that decision, GPOA's choice not to seek summary judgment does not somehow waive its right to pursue a judgment. A party does not have to move for summary judgment if it would not be fruitful, or if the party simply prefers a trial, or wants to request some other kind of hearing. And while the Court set a deadline for dispositive motions, "[i]f necessary," none of the Court's orders explicitly *required* GPOA to file a motion. (*See* DE 41, 43, 45).

Considering the broader course of conduct throughout this dispute, the Court does not find that the doctrines of laches, equitable estoppel, or unclean hands should apply here. A brief review of the facts is appropriate. In 2014, Fozzard effectively abandoned the unit, allegedly owing GPOA somewhere between $10,000 and $16,000. (*See* GPOA Ex. 1; DE 88, 30:8-24). For more than two

years, he was essentially out of contact, except for a single voicemail left for DiMaggio near the end of 2014 stating that he would come back in "a few months." (DE 88, 30:8-24). DiMaggio sent notices to him about the ongoing condo assessments and needed repairs and maintenance, but the mailings came back undeliverable. In November 2017, Fozzard received an offer to buy the property for $160,000, but he did not respond to it[5]. (DE 88, 35:6-24; Fozzard Ex. 5). He also declined to attend the marshals' sale in 2019, or pursue an interest in the government's judgment lien, even though he was represented by counsel. (DE 88, 60:2-62:1). Although Fozzard notes that he was having health issues during this time, which affected his participation (*see id.*, 31:17-18, 46:9-16), he has been represented by counsel throughout this litigation (*see* DE 15, 16). The overall picture suggests that it was Fozzard, not GPOA, who made it difficult to resolve these issues promptly.

Furthermore, in the run-up to the June 10, 2019, deadline for an agreed judgment, it is undisputed that Fozzard was not responding to e-mails from GPOA. (*See* DE 88, 21:12-22:20; DE 93 at 18-19; GPOA Ex. 12) (GPOA's proposed agreed judgment sent on March 12; e-mail correspondence sent by counsel for GPOA on April 15, April 24, May 13, and May 31). Of course, Fozzard was well within his rights not to respond, even though the parties represented in their status report that they would be engaging in settlement discussions. But it is discordant for Fozzard to seek equitable relief based on GPOA's alleged lack of diligence when his own inaction frustrated GPOA's efforts to resolve the claim.[6] "[W]homever seeks equity must do equity . . .

---

[5] Although the testimony about Fozzard's reaction to the offer is unclear, Fozzard did not dispute GPOA's characterization that he did not respond to the offer. (*See* DE 94 at 5).

[6] Fozzard argues that the failed settlement negotiations should not be considered in the context of his laches argument, because settlement and litigation are "on different tracks." The argument is not well taken. As discussed at the hearing, Federal Rule of Evidence 408 establishes that settlement discussions may be admitted for the purpose of "negating a contention of undue delay." Fed. R. Evid. 408(b). Given that laches is based on a party's "knowing acquiescence in existing conditions," *SMDfund, Inc.*, 831 N.E.2d at 729, the Court must be able to consider evidence that would show

[equitable] relief which involves perpetration of an injustice will be denied." *Hopper Res., Inc. v. Webster*, 878 N.E.2d 418, 422 (Ind. Ct. App. 2007) (citing 12 I.L.E. Equity § 25).

More importantly, the facts here do not satisfy the elements of the doctrines of equitable relief. All three doctrines require that the affected party be injured or somehow prejudiced, but the Court finds no clear evidence that the delay itself prejudiced Fozzard. If GPOA had sought summary judgment on June 10, the agreed judgment between Fozzard and the United States would still stand. There is no reason to believe the auction would have gone differently: GRC would presumably still bid one dollar more than the government's offer, which would satisfy Fozzard's obligation to the United States, but not to GPOA. Fozzard would still owe GPOA that money, even if judgment had been resolved with a timely dispositive motion. The fact that GPOA's own request for judgment was late, although frustrating to Fozzard, does not itself constitute injury or prejudice for these purposes. *See Hannum Wagle & Cline Eng'g, Inc. v. Am. Consulting, Inc*., 64 N.E.3d 863, 879 (Ind. Ct. App. 2016) ("Laches does not turn on time alone . . . prejudice or injury is necessary."); *Shriner v. Sheehan*, 773 N.E.2d 833, 846 (Ind. Ct. App. 2002) ("[A]cquiescence and a lapse of time alone do not constitute laches; there must also be prejudice of some sort.").

Laches is particularly inapposite here, because laches is about a delay in *asserting* a right, not in prosecuting it. "[L]aches involves delay in bringing a case, not delay in resolving a case." *Indiana Real Est. Comm'n v. Ackman*, 766 N.E.2d 1269, 1274 (Ind. Ct. App. 2002) (citing *Storm, Inc. v. Indiana Dep't of State Revenue*, 663 N.E.2d 552, 558 (Ind. T.C. 1996)). Even accepting Fozzard's argument that GPOA should have filed some sort of motion before June 10, it is questionable whether that would justify dismissal. *See Rice v. City of Chicago*, 333 F.3d 780, 785-86 (7th Cir. 2003) (dismissal for failure to comply with court orders should be considered "only in

---

whether GPOA was in fact pursuing the claim. The Court does not consider the content of any settlement offers, but does consider the existence of settlement discussions as relevant to Fozzard's own allegations seeking equitable relief.

extreme situations, when there is a clear record of delay or contumacious conduct, or when other less drastic sanctions have proven unavailable"). And Fozzard has not shown that GPOA's delay itself was an intentional effort to prejudice him, which undermines any argument based on equitable estoppel or unclean hands. *See Town of New Chicago v. City of Lake Station ex rel. Lake Station Sanitary Dist.*, 939 N.E.2d 638, 653 (Ind. Ct. App. 2010) ("[T]he basis for equitable estoppel is fraud"); *Wedgewood Cmty. Ass'n, Inc. v. Nash*, 781 N.E.2d 1172, 1178 (Ind. Ct. App. 2003) ("For the doctrine of unclean hands to apply, the misconduct must be intentional.").

Fozzard also argues that GPOA should have bid at the auction if it was still pursuing Fozzard's unpaid debt. For these purposes, the Court does not need to resolve the parties' disagreement about whether GPOA, acting on its members' behalf, was empowered to bid. Fozzard has not shown why GPOA was *obligated* to do so as a matter of diligence, nor that GPOA's failure to do so was inconsistent with its breach of contract claim, and the Court's research has not revealed any authority to that effect. Clearly, it would have been helpful to Fozzard if GPOA bought the property and tried to resell it for a profit to offset Fozzard's debt. (*See* DE 88, 8:25-9:15, 19:22-20:2). But as DiMaggio testified, there would be risk involved in any plan to flip the unit, since GPOA believed that Fozzard had been unable to sell it. (DE 88, 115:8-16). And there is no evidence that GPOA was aware until the auction day that the unit would be available at such a low price. Regardless, the Court sees no reason why GPOA was required to become a real estate investor to recoup Fozzard's debt.

It is understandable that Fozzard, in these circumstances, attempts to invoke doctrines of equitable relief. But while "trial courts have full discretion to fashion equitable remedies," ultimately, "equity follows the law." *City Sav. Bank v. Eby Const., LLC*, 954 N.E.2d 459, 464-65

15

(Ind. Ct. App. 2011). The Court does not find that the doctrines of laches, equitable estoppel, or unclean hands support Fozzard's argument that GPOA is not entitled to judgment.

### E.        Damages

GPOA seeks $80,824.05 in past due assessments, and $12,567.50 in attorney fees. (DE 90, 20:11-24; GPOA Exs. 11, 12). GPOA's damages are based on alleged breaches of its Declaration of Condominium, which set out rules that property owners at 425 Joliet Street must follow. (*See* GPOA Ex. 1). Under Indiana law, damages arising from a breach of contract must be proven "with reasonable certainty," *Ent. USA*, 897 F.3d at 793, and the parties agree that this is the applicable standard here (DE 90, 6:4-15). For the reasons described below, the undersigned recommends that GPOA should be awarded a portion of the damages sought.

#### 1.  Condominium Declaration

The Declaration describes several ways in which GPOA could collect money from Fozzard. First, Fozzard was obligated to pay his share of "Common Expenses," such as the costs of maintenance and repair of the common areas. This was a prearranged amount paid by the unit owners based on the annual budget for Common Expenses prepared each year by GPOA's Board of Directors. (GPOA Ex. 1 at 3, 20, §§ I.K.1, XII.B.1). Next, Fozzard could be made to pay "Special Assessments" arising from "extraordinary or unanticipated items of expense," with the cost to be distributed proportionately among the unit owners based on their percentage of ownership. (*Id*. at 20, § XII.B.2). Finally, GPOA's Board of Directors could issue a Special Assessment specifically against Fozzard's unit if he violated the Declaration's rules. The Declaration sets out the following procedure:

> The Board of Directors shall have the power and authority to impose reasonable special assessments in addition to those provided by Article XII.B.2 . . . The Board of Directors shall not impose a Special Assessment . . . for any [rules] violations unless and until the following procedure is followed:

a.    **Demand**. Written demand [to] cease and desist from an alleged violation shall be served upon the alleged violator specifying: (i) the alleged violation; (ii) the action required to abate the violation; and (iii) a time period, not less than ten (10) days, during which the violation may be abated without further sanction.

b.    **Notice**. If the violation continues past the period allowed in the demand for abatement without sanction, the Association shall serve the violator with written notice of a haring [sic]. The notice shall contain: (i) the nature of the alleged violation; (ii) the time and place of the hearing, which time shall be not less than ten (10) days from the giving of the notice; (iii) an invitation to attend the hearing and produce any statements, evidence and/or witnesses in his/her behalf; and (iv) the proposed sanction to be imposed.

c.    **Hearing**. The hearing shall be held in executive session by the Board of Directors pursuant to the notice affording the violator a reasonable opportunity to be heard. Prior to the effectiveness of any sanction hereunder, proof of notice, the invitation to be heard, the written result and statement of the sanction shall be placed in the minutes of the meeting. Such proof shall be deemed adequate if a copy of the notice together with a statement of the date and manner of delivery is entered by the officer or director who delivered such notice. The notice requirement shall be deemed satisfied if a violator appears at the meeting.

(*Id*. at 23-24, §§ XIII.A.1-2). Unpaid assessments would accrue interest at a rate of 12 percent per year, regardless of whether the unpaid amount was a Common Expense or a Special Assessment. (*See id*. at 22, §§ XII.C.4).

### 2.    GPOA's Claimed Damages

GPOA claims $80,842.05 in past due assessments. In support, it submitted a rolling balance sheet, and 96 invoices documenting charges to Fozzard between January 4, 2013, and March 24, 2020. (GPOA Exs. 4, 11). In summary, the invoices show that Fozzard was billed for a "Common Operating Assessment" and "Common Capital Assessment," and received Special Assessments to his unit specifically, such as fines for a "newspaper left in vestibule," legal fees, and fees for a locksmith and to change batteries in an exit sign. (*See, e.g.,* GPOA Ex. 4 at 1, 2, 34, 43). Beginning in March 2015, shortly after GPOA changed the locks on the unit, he was charged for "utility expenses" for the unit. (*See id*. at 35-96). With each invoice, he was billed for "Finance Charges,"

which DiMaggio testified represented the 12% interest charge for overdue balances. (DE 90, 48:21-49:13).

Fozzard does not dispute that he was obligated to pay the Common Assessments and failed to do so. The undersigned will recommend that he be ordered to repay those amounts, and the corresponding Finance Charges. However, at the damages hearing, Fozzard objected to several of the Special Assessments. The Declaration is clear that, except for "extraordinary or unanticipated" expenses that would be paid proportionally by all owners, GPOA's Board could "not impose a Special Assessment . . . for any violations *unless and until* the [notice and hearing] procedure is followed." (GPOA Ex. 1 at 20, 23, § XII.B.2, XIII.A.2) (emphasis added). That did not happen here. DiMaggio testified that he repeatedly attempted to send notices, but they were frequently returned, and GPOA had no way to contact Fozzard until his counsel appeared in this action. (DE 90, 48:10-20). Those notices were not entered into evidence, so it is not clear whether they satisfied GPOA's rules. Fozzard, for his part, testified that he left at least one voicemail for GPOA. (DE 88, 50:1-17). Regardless, GPOA did not follow the contracted-for procedure to fine Fozzard. Even accepting that DiMaggio sent appropriate notices to Fozzard regarding the individual sanctions, there has been no showing that Fozzard received the required "invitation" to a hearing, advising him of his right to present witnesses and evidence on his behalf, or that a hearing on Fozzard's violations ever occurred.[7]

DiMaggio did not dispute that GPOA's Board failed to follow the sanction procedure in certain instances. Addressing fines levied to Fozzard for newspapers left out in the common area,

---

[7] A hearing was held on August 26, 2020, two months before the marshal's sale, at which GPOA "approve[d] the Fozzard Assessment in all respects and determine[d] that the Fozzard Assessment accurately describes the amount due and owing." (GPOA Ex. 8). There is no indication that Fozzard was appropriately notified, the minutes of the meeting did not address the sanctions specifically, and the meeting occurred after most of the fines were imposed, so this meeting could not have satisfied the requirements for imposing Special Assessments against Fozzard.

DiMaggio testified that an "emergency" provision in the declaration permitted the board to act without a hearing (DE 90, 96:16-97:8). Later, questioned by GPOA's counsel, DiMaggio stated that he was referring to Section V of the Declaration ("Establishment of Easements"), which affords GPOA access to any unit in an emergency or for needed maintenance or repair. (GPOA Ex. 1 at 9, § V). Fozzard never disputed that GPOA had the right to access the unit, or the surrounding area. But this "emergency" provision merely grants GPOA that (uncontested) right of access; it does not address fines or sanctions at all.[8] Based on a plain reading, nothing in that section entitles GPOA to fine or sanction Fozzard without following the agreed procedure.

In general, GPOA is entitled to recoup losses caused by Fozzard's breaches as provided for in the Declaration (*see* GPOA Ex. 1 at 25, §§ XIII), but not to additional fines or penalties it attempted to impose beyond what was permitted by the Declaration. However, GPOA is entitled to the cost of utilities to prevent damage to the unit, even though the Declaration's sanction procedure was not followed for those utilities, because the contract allows for the recovery of damages caused by Fozzard's breaches. *See* (GPOA Ex. 4 at 34-96); (DE 88, 93:19-94:13; DE 90, 47:1-15, 84:18-22, 98:25-99:9); (GPOA Ex. 1 at 25, § XIII.B ("In addition to the [contractual] remedies . . . legal remedies may include, without limiting the same, an action to recover sums due to damages . . ."). GPOA is not entitled to the fines for newspaper removal, returned checks, and locksmith fees[9]. (*See* GPOA Ex. 4 at 1-6, 8, 34). It has not demonstrated to a reasonable certainty that those costs were incurred because of Fozzard's breaches. Rather, they appear to be "extra"

---

[8] DiMaggio testified that he also relied on a list of rules and regulations in the back of the Declaration. (DE 90, 126:6-22). Although the list could support a finding that Fozzard had broken a rule, it does not appear to confer on GPOA the right to sanction him without a hearing. (*See* GPOA Ex. 1 at 56-58).

[9] Because there is no dispute that GPOA had its own set of keys to the unit and the right of access to the unit, at least prior to the auction (DE 88, 82:25:83-8, 100:19-22), GPOA has not shown that Fozzard's breaches of the contract required it to engage a locksmith.

19

penalties that GPOA attempted to impose without following the contracted-for procedure for those fines. GPOA is therefore entitled to all assessments levied on Fozzard between January 4, 2013[10] and October 30, 2019 ($68,317.05), minus the wrongly imposed Special Assessments and the corresponding Finance Charges of 12 percent interest per year on those assessments ($1,828.67)[11], for a total of $66,488.38.

Finally, GPOA seeks attorney fees arising from this litigation. In Indiana, attorney fees are generally recoverable as damages in a breach of contract action only to the extent required by a statute, rule, or contract. *Masonic Temple Ass'n of Crawfordsville v. Indiana Farmers Mut. Ins. Co.*, 837 N.E.2d 1032, 1037 (Ind. Ct. App. 2005). In this case, the Declaration provides that the "prevailing party [in an action for damages] shall be entitled to recover the costs of any legal proceeding including reasonable attorney's fees." (GPOA Ex. 1 at 25, § XIII.B). The court has wide discretion in determining reasonable attorney fees, and can consider factors such as the rate charged, the result achieved, the difficulty of the legal issues, and the "responsibility of the parties in incurring the [ ] fees." *Nunn Law Office v. Rosenthal*, 905 N.E.2d 513, 516 (Ind. Ct. App. 2009); *H & G Ortho, Inc. v. Neodontics Int'l, Inc.*, 823 N.E.2d 734, 737 (Ind. Ct. App. 2005).

Prior to the evidentiary hearing, Fozzard objected to GPOA's request for fees, arguing that they were not itemized and "very little work appears to have been done" by counsel for GPOA.

---

[10] GPOA's damages figure of $80,842.05 included arrearages going back to August 4, 2006, the last date Fozzard's account was current based on GPOA's records. However, the earliest invoice submitted to the Court was dated January 4, 2013. (*See* GPOA Ex. 4). GPOA therefore seeks $8,311.74 in arrearages between 2006 and 2012 for which it submitted rolling monthly balances, but no itemized invoices. (*See* GPOA Exs. 5, 11). At the hearing, DiMaggio testified that Fozzard would have received regular invoices, and did not object to any assessments, but did not testify as to the basis for the underlying assessments during that time. (*See* DE 90, 52:6-54-25, discussing Ex. 5). Given the record demonstrating that Fozzard was inappropriately charged for some assessments, the Court does not find that the balance figures demonstrate with reasonable certainty that GPOA was entitled to those damages under the contract.

[11] January 2013 fees amounting to $725 (GPOA Ex. 4 at 1-6, 8), with interest compounded through October 2019, equal $1,620.85; March 2015 fees amounting to $124.80 (GPOA Ex. 4 at 34) with interest compounded through October 2019, equal $207.82; $1,620.85+$207.82=$1,828.67.

(DE 64). At the hearing, GPOA entered an affidavit and itemization of fees from its counsel into evidence, seeking $12,567.50 for 45.7 hours of attorney work at a rate of $275.00 per hour. (GPOA Ex. 12). The hours worked and the hourly rate are reasonable for the work ultimately performed by GPOA's counsel. However, to at least some extent, GPOA lengthened this litigation by delaying its request for judgment and then seeking a joint judgment and damages hearing, when the matter would have been more efficiently resolved in the traditional manner of seeking a judgment before attempting to litigate damages. The Court will therefore reduce the requested fees by 10 percent, for a total of $11,310.75. That figure, added to the contract damages of $66,488.38, creates a final damages figure of $77,799.13.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

For the reasons described above, the undersigned makes the following factual findings and conclusions of law, as required by Federal Rule of Civil Procedure 52(a) and (c):

### A.  Findings of Fact

1. As the owner of Unit 312 at 435 Joliet Street, Dyer, IN, Fozzard was bound by GPOA's Declaration of Condominium, which granted GPOA the power to collect certain fees and expenses from Fozzard for the upkeep of 425 Joliet Street and his unit specifically, including reasonable attorney fees necessary to collect these amounts. (DE 90, 18:24-19:9; GPOA Ex. 1).

2. Fozzard failed to pay certain costs assessed by GPOA. These fines included "Common Expenses," assessed to all condominium members, and "Special Assessments," which were assessed to Fozzard for rules violations or reimbursements of expenses borne by GPOA related to Fozzard's unit. (*See* DE 88, 31:19-32-4, 67:3-18; GPOA Exs. 1, 4, 11).

3.  Fozzard did not receive a hearing, or notice of an invitation to a hearing, in advance of the "Special Assessments" being levied. (*See*, *e.g.*, DE 90, 96:16-97:8).

4.  GPOA placed a lien on the property based on the unpaid assessments. (GPOA Ex. 6).

5.  Following the United States's foreclosure complaint, GPOA timely filed a cross-claim against Fozzard for breach of contract, and a counter-claim based on its junior lien for assessments unpaid by Fozzard. (DE 1, 10).

6.  Having failed to reach a settlement with Fozzard, GPOA declined to file a motion for summary judgment by June 10, 2019, and did not request an evidentiary hearing until March 4, 2020. (*See* DE 45, 56).

7.  Pursuant to the entry of an agreed judgment between the United States and Fozzard, the unit to GRC was sold at a marshal's sale for $19,697.46. GPOA did not bid for the property. (DE 54, 57; DE 90, 79:11-82:14).

8.  The unit sold at the marshal's sale for less than its market value. The appraisals and previous offer introduced by Fozzard showing a value of $155,000-$170,000 were persuasive evidence of the market value of the property, but were not persuasive as to the value of the property in the context of a judicial sale. (*See* Fozzard Exs. 1, 2, 4).

9.  The proceeds of the sale were sufficient to cover the balance of the United States's judgment against Fozzard, but not the junior lien held by GPOA. (*See* DE 85, ¶¶ 2-3).

10. Both GPOA and Fozzard have been fully heard on the issues of liability and damages, and both declined to submit any further evidence or argument. (*See* DE 88, 90, 92-94, 96, 99).

## B. Conclusions of Law

1. Based on the proceedings conducted to date, the Court may enter judgment pursuant to Federal Rule of Civil Procedure 52(c). *See* Fed. R. Civ. P. 52(c).

2. Considering the evidence presented by Fozzard, and particularly the distinction between the property's market value and the value at a judicial sale, the disparity between the sale price and the value of the property was not "so great as to shock the sense of justice and right" such that the marshal's sale should be set aside. *Arnold*, 496 N.E.2d at 65.

3. The overall circumstances of the marshal's sale were not "shocking to the court's sense of conscience and justice" such that the sale should be set aside. *Id*.

4. Fozzard was not prejudiced by GPOA's delay in seeking judgment in the manner required for the doctrines of laches, equitable estoppel, or unclean hands to apply. *Am. Consulting*, 64 N.E.3d at 879.

5. GPOA was not required to bid for the unit at the marshal's sale as a matter of "diligence" in pursuing a judgment. Even if such a standard existed, GPOA's decision not to file a summary judgment motion is not the kind of delay to which laches applies. *Rice*, 333 F.3d at 785-86; *Ackman*, 766 N.E.2d at 1274.

6. GPOA's decision not to move for summary judgment did not amount to fraud or "intentional misconduct" against Fozzard. Under these circumstances, the doctrines

of equitable estoppel and unclean hands are not applicable. *Town of New Chicago*, 939 N.E.2d at 653; *Wedgewood Cmty. Ass'n*, 781 N.E.2d at 1178.

7.  GPOA has shown to a reasonable certainty that it is entitled to damages caused by Fozzard's failure to pay the Common Expenses assessed by GPOA. *Ent. USA,* 897 F.3d at 793.

8.  Because GPOA did not follow the Declaration's procedure for imposing Special Assessments, it is entitled to recover those costs only to the extent reasonably established as damages caused by breaches of the Declaration by Fozzard. Accordingly, GPOA is not entitled to recover newspaper removal, returned check fees, and locksmith fees, but is entitled to all other documented assessments, including the cost of utilities. (*Id*.; GPOA Exs. 1, 4).

9.  The time frame for which GPOA is entitled to recover these past due assessments is January 4, 2013, the date of GPOA's first invoice documenting the basis for the assessments, through October 30, 2019, the date of the auction, because those are the dates for which it has established damages to a reasonable certainty. *Ent. USA,* 897 F.3d at 793; (GPOA Ex. 4).

10. Under the Declaration, GPOA is entitled to reasonable attorney fees for litigating this action, which amount to $11,310.75. *See Masonic Temple Ass'n*, 837 N.E.2d at 1037; *H & G Ortho, Inc*, 823 N.E.2d at 737; (GPOA Ex. 1 at 25, § XIII.B); (GPOA Ex. 12 at 5-6).

## III.    CONCLUSION

Having considered the evidence and argument presented, the Court **RECOMMENDS** that the District Court **GRANT** the remaining relief requested in the Motion to Set Damages Hearing

[DE 56] and **ENTER JUDGMENT** for Cross-Claimant GPOA and against Cross-Defendant Jerry Fozzard, in the amount of $77,799.13.

This Report and Recommendation is submitted pursuant to 28 U.S.C. § 636(b)(1)(C). Pursuant to 28 U.S.C. § 636(b)(1), the parties shall have fourteen (14) days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court. The failure to file a timely objection will result in waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. *Willis v. Caterpillar, Inc.*, 199 F.3d 902, 904 (7th Cir. 1999); *Hunger v. Leininger*, 15 F.3d 664, 668 (7th Cir. 1994).

So ORDERED this 9th day of May, 2022.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT